1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**

9               **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   AMY DAVIS,                                    CASE NO. 11cv1193-H (MDD)

12                              Petitioner,        REPORT AND
                                                   RECOMMENDATION OF
13               vs.                               MAGISTRATE JUDGE RE:
                                                   PETITION FOR WRIT OF HABEAS
14   JAVIER CAVAZOS, Warden, et al.,               CORPUS
                                                   [Doc. No.1]
15                              Respondents.

16                              **I.  INTRODUCTION**

17           This Report and Recommendation is submitted to United States District Judge Marilyn L.

18   Huff pursuant to 28 U.S.C. § 636(b) and Local Civil Rule H.C.2 of the United States District Court

19   for the Southern District of California.  After reviewing the Petition (Doc. No. 1), Respondent's

20   Answer and Memorandum of Points and Authorities in support thereof ("Answer") (Doc. No. 7),

21   Petitioner's Traverse (Doc. No. 18), and the supporting documents and pertinent state court

22   lodgements, the Court recommends the Petition be **DENIED** for the reasons stated below.

23                            **II.  PROCEDURAL HISTORY**

24           On June 1, 2011, Amy Davis ("Petitioner"), a California state prisoner, filed a Petition for

25   Writ of Habeas Corpus by a Person in Custody pursuant to 28 U.S.C. § 2254.  (Doc. No. 1).  In the

26   request, Petitioner alleges that she received ineffective assistance from both her trial and

27   sentencing counsel because of their failure to investigate and present a theory of defense.  (Doc.

28   No. 1).  On September 7, 2011, Respondents filed an Answer.  (Doc. No. 7).  Petitioner filed an

1   untimely Traverse on February 2, 2012.  (Doc. No. 18).

2         Petitioner was sentenced to life in prison without possibility of parole on January 11, 2008.

3   On June 22, 2009, the California Court of Appeal (Fourth District Division One) denied

4   Petitioner's appeal on grounds unrelated to her ineffective assistance of counsel claim.  The

5   California Supreme Court denied review on September 9, 2009.  (Lodgment Nos. 4, 7, 8).

6   Petitioner then filed a request for writ of habeas corpus, alleging ineffective assistance of counsel,

7   which was denied by the California Supreme Court on May 18, 2011.  (Lodgement 11).

8                  **III.  STATEMENT OF FACTS**

9         28 U.S.C. § 2254(e)(1) provides: "[A] determination of a factual issue made by a State

10  court shall be presumed to be correct."  Petitioner has "the burden of rebutting the presumption of

11  correctness by clear and convincing evidence."  *Id.*; *see also Jeffries v. Wood*, 114 F.3d 1484, 1499

12  (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997)) (stating that

13  federal courts are required to "give great deference to the state court's factual findings.")

14  Accordingly, the following facts are taken from the California Court of Appeal's opinion:

15        The victim, 57-year-old Theodore Salanti, and the defendant, 24-year-old Davis, were
          friends. Although the two apparently did not have a sexual relationship, Salanti's
16        friends believed that he wished that Davis was his girlfriend. Salanti often gave
          Davis generous sums of money, provided her with drugs, and allowed her to use his
17        car. Davis was a frequent guest at Salanti's condominium.

18        Salanti was a drug dealer and user. He was known to keep large quantities of drugs,
          including methamphetamine and marijuana, in a safe located in his
19        bedroom/workroom, and in other places around his condominium. He also was
          known to keep large sums of cash–often between $20,000 and $100,000–in his home.
20        He kept drugs and cash in a home safe, and would sometimes hide cash under his
          carpet. Salanti often bragged about his money.
21
          Davis stole approximately $30,000 from Salanti at one point approximately a year
22        before Salanti was killed. According to Davis, she offered to give the money back to
          Salanti, but he allowed her to keep it, told her not to steal from him again, and said
23        that if she ever needed anything, she could just ask him for it.

24        ***Salanti's Disappearance***

25        One of Salanti's closest friends last saw Salanti alive on Friday, September 23, 2005.
          In the very early morning hours of September 23, Salanti sent an e-mail to Davis in
26        which Salanti said, "Hey, I'm just forgetting about you. You [ sic ] back with your
          ex, so don't call or come over." Davis went to Salanti's home on Saturday, September
27        24.

28        At 3:12 p.m. on September 24, Davis went to a 7-Eleven store near Salanti's
          condominium and bought a Slurpee, a Gatorade, M & M's, Blistex, and cigarettes.

She paid with a $100 bill.

At 4:00 a.m. on September 25, Davis went to a Sav-On drugstore and purchased a "Wonder Wheeler" [cart]. Davis also returned to the 7-Eleven nine different times that day, and bought, among other things, various cleaning products.

At about 5:30 p.m. on September 26, a locksmith called to follow up with Salanti regarding work that the locksmith had begun on Salanti's car on either September 23 or 24. The locksmith had made a number of unsuccessful attempts to reach Salanti by telephone during the intervening days. However, on the evening of September 26, a woman answered Salanti's telephone and told the locksmith that Salanti had gone out to get something to eat.

Salanti's neighbors saw Davis in the condominium complex and driving Salanti's car between September 23 and September 28. One neighbor saw Davis wearing a bathing suit. Davis appeared to be walking to or from the complex pool. On September 28, Davis was pulled over by California Highway Patrol officers while she was driving Salanti's car.

**Discovery of Salanti's Body**

On Thursday, September 29, Salanti's friends called 911 after they had been unable to reach Salanti for a number of days and had observed things that they thought were suspicious inside his condominium. Fire officials responded to the call and pried open the front door. Once the door was open, they smelled the odor of a decomposing body. The fire officials discovered Salanti's body inside a suitcase in the entryway. The suitcase was wrapped in duct tape and covered with a comforter and a sleeping bag.

Salanti's face, including his nose and mouth, was covered in duct tape. His hands were tied behind his back with rope. There was duct tape around Salanti's right ankle. Two of his pants pockets were pulled inside out. His empty wallet was found in the master bedroom.

The medical examiner determined that Salanti had been dead for several days before his body was discovered. The cause of death was determined to be "homicidal violence including asphyxiation." Salanti's body was bruised, and he had six fractured ribs. Salanti's body tested positive for amphetamines, fentanyl and marijuana.

Police found Davis's DNA on several items inside Salanti's condominium, including cigarette butts, a plastic cup, a latex glove found in the trashcan, a knife handle, and a box cutter. A piece of latex glove with Davis's DNA on it was found attached to duct tape that matched the duct tape on Salanti's body. Davis's fingerprints were found all over the condominium.

At approximately 1:30 p.m. on Saturday, September 24, someone performed an internet search on Salanti's computer seeking information concerning Liberty floor safes. Additional searches were performed between 4:00 p.m. and 10:00 p.m. that day regarding how to locate and open safes. On Tuesday, September 27, between 1:00 p.m. and 2:00 p.m., two searches were conducted on Salanti's computer. One involved how to get rid of the odor from a decaying body, and the other involved how to find a floor safe and open it.

In Salanti's car, investigators found papers that contained Salanti's banking information, blank checks, and documents regarding safes.

***Davis' Initial Statements to Police***

On October 1, 2005, San Diego police officers went to Davis's mother's home where they met with Davis. Davis agreed to accompany the officers to the police station for an interview. On the way to the station, Davis told the officers that she had been driving Salanti's car, and took them to the car. During the interview, Davis said that she had last seen Salanti alive on Thursday, September 22. She claimed that on that day, she borrowed Salanti's car because her car had broken down. Davis denied any knowledge of Salanti's death. She admitted to detectives that in the past she had stolen $30,000 from Salanti. According to Davis, Salanti had forgiven her.

Davis told the detectives that Salanti usually kept more than $100,000 in his condominium, and that he kept money in the safe in his home, and also hid money in other places throughout the home. Davis said that she knew the combination to Salanti's safe because he had given it to her. Detectives noticed that Davis had scratches on both of her hands.

On October 2, the day after Davis first spoke to detectives, Davis called detectives and left a voicemail message in which she indicated that she had more information for them. Detectives met with Davis on October 4. She told the detectives that she had failed to tell them something on the previous occasion when she spoke with them because she was scared. She said that she had called the detectives to ask to speak with them again after she told her brother and mother "everything." Davis told the detectives that she knew that two men had been involved in Salanti's death. According to Davis, two men who were armed with a knife approached her outside of Salanti's condominium while Salanti was gone. The men entered Salanti's condominium and stole his marijuana from a kitchen cupboard. The men then forced Davis to sit in the room where Salanti's desk was located. She heard Salanti come in, and she could hear the two men beating him. She tried not to listen, and claimed that she did not know what else had happened. Davis told the detectives that she ran outside, and that the two men told her to drive them to the intersection of El Cajon Boulevard and Utah Street. She asked the men whether they had hurt Salanti, and they assured her that they had not. One of the men said that he wanted Salanti's computer, so they were going to come back to Salanti's condominium. The men told Davis not to tell anyone about what had occurred.

Davis returned to Salanti's condominium alone, and sat outside. She assumed that this is when Salanti's neighbors saw her. However, Davis did not know on which day this occurred. She explained she "was using" at the time. According to Davis, the men returned to Salanti's condominium two more times. They repeatedly threatened her and forced her to search the condominium for hidden money and drugs. After they left the last time, Davis entered the condominium. She did not see Salanti and did not know where he was. However, later during the interview, Davis said that she found Salanti's lifeless body in a closet while the two men were in another room. She said that she did not know how Salanti's body ended up in the suitcase.

Davis alternatively claimed that the cart she purchased was for laundry, trash, or for "everything else" the men were going to steal from Salanti's place. Davis said that she was scared to call the police because the men were in a gang and could find her if she said anything to the police. Davis eventually admitted that she had taken drugs from Salanti's safe. She said that there had been a plan, and that she was going to "get a cut of money" and drugs for helping the men.

Davis said that after this all happened, she went to a friend's house. Davis told her friend what had happened and said that she was scared of the men.

### Davis' Arrest

On October 12, 2005, police arrested Davis. Davis waived her *Miranda* rights and agreed to speak with detectives again. Davis reiterated that she did not know the two men, and said that they had approached her while she was outside Salanti's condominium, smoking. The men told her that they knew who she was, and said that they "knew [Salanti]'s whole situation." The men told Davis that they wanted to go inside Salanti's home, and said, "[W]e're here for a purpose and you already know what the purpose is and just work with us and I'll even give you a little bit of money."

According to Davis, the men went inside and found Salanti's marijuana. They told Davis to close the blinds. The men asked Davis to open the safe, which she did, but there was no cash in it. After a while, Davis thought that the men had left, and she played dominos on the computer. She went outside, and the two men returned. They forced her to go inside and then began to search for something in the kitchen. Davis went back into the office and started playing dominos again. Davis said that she did not know when Salanti came home, and that she did not hear him say anything to the men when he returned. She eventually heard a "ruckus" and then heard "kind of like a moan." Davis was surprised that Salanti had come into the home without her having seen him, since she had been watching out the office window for him to return.

After she heard the noises, Davis "knew immediately that they beat [Salanti] up." She "just froze inside." One of the men came into the room where Davis was and told her that "everything [was] gonna be their way now." Davis started to cry and asked the men where Salanti was. The men told Davis that they had beat up Salanti, but said that he was fine. They ordered her to search the house. Davis thought that the men were holding Salanti hostage and that if she helped them, they would leave. Davis proceeded to search the condominium for money. She eventually told the men that she could not find anything, but they told her to "try harder." Davis said that the men sent her to Sav-On to buy a cart so that the men could load it up with the things they wanted to take from Salanti's condominium.

Davis told police that she did not know that the men had killed Salanti at the time she was searching for the money. She eventually found Salanti's body in the closet while she was searching the bedroom. Davis thought one of the men might have seen her looking in the closet where she found Salanti's body, but she tried to pretend that she did not know that Salanti was dead. The men ordered her to take clothes out of a suitcase, but she did not think that they were going to put Salanti's body in it. Davis said that she did not see the men put Salanti's body in the suitcase, but admitted that she helped them put duct tape around the suitcase.

The men had Davis drive them to El Cajon Boulevard and drop them off. After she dropped them off, Davis returned to Salanti's condominium. She estimated that the entire ordeal lasted approximately two days. Davis remained at Salanti's condominium until at least Tuesday, September 27.

### Davis' Trial

Davis testified at trial. She continued to maintain that the two men who approached her outside Salanti's condominium had a knife, and that they had threatened her. She said that she did not know that Salanti had been killed until after she dropped off the men near El Cajon Boulevard. Davis testified that she had not found Salanti's body in a closet, but rather, that she found the body, already in the suitcase, after she returned from dropping off the two men.

At trial, Davis admitted that she had lied to the detectives when she told them that the men had directed her to look for money and drugs. She said that she had not opened the safe while the two men were still at the house, but after they had left. Davis acknowledged that she, alone, had caused all of the damage that had been done to Salanti's condominium. She explained that after she found Salanti dead, she did not know where to go. She was high on methamphetamine and thought that Salanti might have hidden money in a secret safe. Davis thought that if she found the money, she "could just run, basically, because [she] was freaked out." Davis also admitted that she was the one who had dragged the suitcase with Salanti's body inside to the front entryway of the condominium. When asked why she had done that, Davis replied, "I was trying to cover everything up. I thought that I could make everything just kind of go away. That's why there was a blanket on it. I didn't know what I was doing, to be honest. I just-I was freaked out. I didn't know what to do. I didn't-there was no way I was going to call the authorities, and I had nobody. I didn't know what to do, so I made a lot of stupid mistakes."

Davis disclaimed having helped the two men put duct tape on Salanti's body, and retracted her earlier admission to detectives that she had handed strips of the duct tape to the men. She admitted that she had used duct tape on a wall in the dining room and that she had put duct tape over the blanket that was found on top of the suitcase.

Davis testified that she did not intend to steal from Salanti when the men approached her on Saturday, September 24, or when she let the men into the condominium. She said that she also did not intend to steal from Salanti when she heard the men beating him up. Davis stated that she never had an agreement with the men for a "cut" of whatever was found in exchange for her participation in a scheme to steal from Salanti. She said that the reason she did not call the police after the incident was because Salanti had been robbed a number of times and had never reported any of the crimes to authorities. She said that Salanti had indicated to her that he did not want such incidents reported to the police.

Dr. Alex Stalcup, medical director of the New Leaf Treatment Center in Lafayette, California, testified as an expert on methamphetamine use. Dr. Stalcup opined that during her interviews with police, Davis was going through the "crashing phase of the methamphetamine binge cycle." Dr. Stalcup testified that Davis's conduct after Salanti's death was consistent with that of a person on a methamphetamine binge or in the "tweaking" phase, which usually occurs 18 to 24 hours "into the binge, [and is a state] in which they maintain intoxication." According to Dr. Stalcup, individuals who are tweaking are "able to think, but they're very very, high."

(Lodgment 7 at 3-12) (footnotes omitted).

## IV. STANDARD OF REVIEW

28 U.S.C. § 2254(a), provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Here, the Petition was filed after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. §

2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

When determining what constitutes "clearly established federal law" under § 2254(d)(1), federal courts look to United States Supreme Court holdings at the time of the state court's decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A state court's decision is "contrary to" clearly established United States Supreme Court precedent if (1) the state court applies a rule different from the governing law set forth in Supreme Court cases, or (2) the state court confronts a set of facts that are materially indistinguishable from a Supreme Court case, but still reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06, 412 (2000); *Lockyer*, 538 U.S. at 73. A state court decision does not have to demonstrate an awareness of clearly established Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradict such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court decision may involve an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. Alternatively, an unreasonable application may be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer*, 538 U.S. at 76. Instead, the state court's application must be "objectively unreasonable." *Id.* Petitioner bears the burden of proving the state court acted in an unreasonable, or contrary manner. *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).

- 7 -

1    The United States Supreme Court has held that "[w]here there has been one reasoned state

2    judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting

3    the same claim rest upon the same ground." *Y1st v. Nunnemaker*, 501 U.S. 797, 803 (1991).

4    When the state court does not supply reasoning for its decision, an independent review of the

5    record is required to determine whether the state court clearly erred in its application of

6    controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This independent

7    review is not *de novo*. *Id*. Although the federal court independently reviews the record, it defers

8    to the state court's ultimate decision. *Pirtle v. Morgan*, 313 F.3D 1160, 1167 (9th Cir. 2002).

9    Therefore, the Court will conduct an independent review of whether the California

10   Supreme Court's decision to deny Petitioner's request for writ of habeas corpus was objectively

11   unreasonable under United States Supreme Court jurisprudence.

12                                    **V. DISCUSSION**

13   Petitioner claims that her defense counsel at trial and sentencing were ineffective because

14   they failed to (1) conduct a competent investigation of a possible Battered Woman Syndrome[1]

15   ("BWS") defense; (2) schedule a BWS evaluation by a qualified expert; and (3) present known

16   BWS evidence at trial and sentencing. Petitioner asserts that had her trial and sentencing counsel

17   presented this evidence, her trial may have had a different outcome and her sentence might have

18   been reduced.

19   In their Answer, Respondents asserts that Petitioner's ineffective assistance of counsel

20   claim fails because a BWS defense is not applicable to the facts of the case and would not have

21   been admissible at trial. (Doc. No. 7 at 11). Respondents contend that Petitioner's trial and

22   sentencing counsel could not be considered ineffective for failing to present an irrelevant defense.

23   (Doc. No. 7 at 14). Consequently, Respondents assert that the California Supreme Court properly

24   denied Petitioner's request and the Petition should be denied. (Doc. No. 7 at 15).

25   A federal court may not grant a state prisoner's habeas application unless the relevant state-

26   court decision "was contrary to, or involved an unreasonable application of, clearly established

27   _____

28       [1] Both Petitioner and Respondents use the term "Battered Woman Syndrome" as it was used at trial. Although the term is now referred to as "Intimate Partner Battering," the Court will continue to use the term "Battered Woman Syndrome" or "BWS" to be consistent with the Petition and Answer.

Federal law, as determined by the Supreme Court of the United States." (AEDPA), 28 U.S.C. § 2254(d)(1) (2006). Here, the California Supreme Court summarily denied Petitioner's habeas application without comment. (Lodgement 11). Since there is no reasoned opinion in Petitioner's case denying the claims, the Court must undertake an independent review of the record to determine whether the state court's denial was objectively reasonable.

### A.   The *Strickland* Standard

The Sixth Amendment, as made applicable to the states through the Fourteenth Amendment, entitles a criminal defendant to the effective assistance of counsel. U.S. Const. amends. VI, XIV. In *Strickland v. Washington*, 466 U.S. 687, 688 (1984), the Court held that the right to the effective assistance of counsel is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense. In such cases, a petitioner is required to overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy[,]'" and must show both incompetence and prejudice. *Id.* at 689 (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of a counsel's performance must be highly deferential" and there should be a strong presumption that counsel's performance falls within "the wide range of reasonable professional assistance." *Id.* A showing of prejudice must assert with reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

*Strickland*'s requirements also apply to sentencing counsel. *Lang v. Cullen*, 725 F.Supp.2d 925, 1027 (2010) (*citing Gardner v. Florida,* 430 U.S. 349, 358 (1977)). Just as a court evaluates ineffective assistance during the trial phase, "we must avoid the temptation to second-guess [sentencing counsel's] performance or to indulge 'the distorting effects of hindsight.'" *Mayfield v. Woodford,* 270 F.3d 915, 927 (2001) (quoting *Strickland,* 466 U.S. at 689). The "principal concern" is "not whether counsel should have presented a mitigation case ... [r]ather, [the] focus [is] on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background *was itself reasonable.*" *Wiggins v. Smith,* 539 U.S. 510, 522-23 (emphasis in original).

*Strickland* and its progeny provide the federal law controlling claims of ineffective trial and

1  sentencing counsel.  Following the AEDPA, the scope of this Court's review is limited to

2  ensuring that the California Supreme Court did not unreasonably or incorrectly apply *Strickland*

3  to the facts alleged in Petitioner's federal habeas application.  Petitioner bears the burden of

4  proving the *Strickland* standard was not met.  As discussed below, this Court finds that the

5  evidence that Petitioner accuses her counsel of withholding was not admissible in her case.

6  Consequently, Petitioner has not met her burden of showing that her counsel were incompetent

7  nor that she was prejudiced.  Accordingly,  the California Supreme Court did not unreasonably or

8  incorrectly apply *Strickland* in denying Petitioner's request for habeas corpus.

9  **B.     Reasonableness of Counsel in Excluding BWS Evidence**

10  Petitioner asserts that her BWS defense stems from her history of abusive relationships,

11  particularly with a man named Marvin Pope who she claims coerced her throughout the incident

12  in Theodore Salanti's apartment.  (Doc. No. 1 at 1).  It is this history that she alleges could have

13  altered the outcome of her trial or mitigated her sentence.  (Doc. No. 1 at 1).  Petitioner points to

14  several instances where both trial and sentencing counsel should have reasonably been put on

15  notice of a viable BWS claim.  (*See generally* Doc. No. 1).

16  Petitioner claims that her trial counsel, Terry Zimmerman, was on notice of the relationship

17  between Pope and Petitioner and that a "reasonable" attorney would have pursued a BWS claim.

18  (Doc. No. 8-9).  Specifically, Petitioner notes Zimmerman's acknowledgment that Petitioner

19  attended counseling sessions on July 20 and 22, 2005, in which Petitioner discussed her

20  susceptibility to Pope's control.  (Doc. No. 1 at 8).   Petitioner claims that the outcome of the trial

21  may have been different had Zimmerman followed up on this knowledge and presented evidence

22  of BWS.   (Doc. No. 1 at 9).

23  Petitioner also contends that her sentencing counsel, Elliott Kanter, likewise was

24  incompetent.   Petitioner claims Kanter ignored recommendations to raise a BWS claim from the

25  doctor who conducted Petitioner's psychotherapy sessions.  (Doc. No. 1 at 9).  Petitioner also

26  points to Kanter's failure to present BWS evidence in light of the sentencing judge's request to

27  "digress" into Petitioner's credibility after expressing reservations about sentencing Petitioner to

28  life without the possibility of parole.  (Doc. No. 1 at 10).  Petitioner also references two letters

1    from jurors who expressed to the sentencing judge their belief that Petitioner's sentence was too

2    harsh.  (Doc. No. 1 at 10).

3           In order to determine if counsel were ineffective, the Court must first examine whether

4    BWS evidence is relevant under Petitioner's circumstances.  If relevant, then the Court must

5    determine whether such evidence would have been admissible.  Only if the BWS evidence were

6    relevant and admissible could the Court consider whether Petitioner's counsel were ineffective

7    for not presenting it.  Because the Court finds that Petitioner's potential BWS evidence is

8    irrelevant and inadmissible under California law, the Court finds that counsel were not

9    incompetent for failing to introduce it.

10                    **1.       Admissibility of BWS Evidence at Trial**

11          The California Supreme Court defines BWS as "a series of common characteristics that

12    appear in women who are abused physically and psychologically over an extended period of time

13    by the dominant male figure in their lives." *People v. Humphrey*, 13 Cal.4th 1073, 1083-84

14    (1996).  The California Legislature codified the admissibility of BWS evidence in section 1107 of

15    the California Evidence Code, which allows a properly qualified expert to testify to BWS when:

16           (a) In a criminal action, expert testimony is admissible by either the prosecution or the
             defense regarding intimate partner battering and its effects, including the nature and effect
17           of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims
             of domestic violence, except when offered against a criminal defendant to prove the
18           occurrence of the act or acts of abuse which form the basis of the criminal charge.

19           (b) The foundation shall be sufficient for admission of this expert testimony if the
             proponent of the evidence establishes its relevancy and the proper qualifications of the
20           expert witness. Expert opinion testimony on intimate partner battering and its effects shall
             not be considered a new scientific technique whose reliability is unproven.
21

22    Section 1107 applies equally to the both trial and sentencing counsel.  *See* Cal. Evid. Code § 300

23    (West 2012) ("[e]xcept as otherwise provided by statute, this code applies in *every* action before

24    the Supreme Court or a court of appeal or superior court ...") (emphasis added).

25          The admissibility of evidence showing the effects of BWS hinges largely on relevance.
      *See People v. Gadlin*, 78 Cal.App.4th 587, 592 (2000).  In *People v. Erickson*, 57 Cal.App.4th

26    1391, 1399 (1997) , the court explained that BWS evidence is relevant: (1) to establish that the

27    defendant acted in self-defense; (2) to establish "imperfect self-defense"; or (3) to repair

28    defendant's credibility.  (citing in part *People v. Day*, 2 Cal.App.4th 405, 415 (1992) (overruled

1    on other grounds by *Humphrey*, 13 Cal.4th 1073)).  Evidence to repair credibility is admissible to

2    show that recantation of an abuse claim is common among victims of BWS.  *People v. Brown*, 33

3    Cal.4th 892, 904 (1996).  Thus, a victim of BWS can only establish relevance to mitigate

4    responsibility when the allegedly abusive partner is the victim of the crime charged.

5          The *Erickson* Court also explicitly rejected using BWS evidence to show a victim's intent

6    or thoughts at a given time.  57 Cal.App.4th at 1401.  In *Erickson*, the court held that evidence of

7    syndromes like BWS should be admitted solely to disabuse jurors of "common sense"

8    misconceptions about the behavior of persons in affected groups and not to prove a fact in issue.

9    *Id.*  The court held that "while [BWS] testimony may be admissible to explain how defendant's

10   asserted subjective perception of need to defend herself would reasonably follow from her

11   experience as battered woman, [an] expert is not permitted to testify as to expert's opinion that

12   defendant actually perceived that she was in danger and needed to defend herself."  *Id.* at 1399.

13         Petitioner points to two cases where defense counsel's failure to introduce expert testimony

14   regarding BWS constituted ineffective assistance of counsel: *In Re Walker*, 147 Cal.App.4th 533,

15   538 (2007) and *Day*, 2 Cal.App.4th at 415.  These two cases, however, involved defendants who

16   had killed their alleged abusers and, consequently, are inapposite here.

17         Accordingly, BWS testimony was not relevant in Petitioner's case and would not have

18   been admissible.  Petitioner asserts that she wants to show that she was not wholly responsible for

19   her actions during the crime because Pope blackmailed her.  This is not an acceptable use of BWS

20   evidence under *Erickson*.  Petitioner is not claiming self-defense and, to the extent that she desires

21   to repair credibility, she is not recanting any prior claims of abuse.  Petitioner's argument that

22   BWS evidence may be used to repair credibility generally, as she asserts in her Traverse,

23   improperly interprets the narrow use of BWS evidence in *Brown.*

24         Petitioner also wishes to use a BWS expert in support of a duress defense.  (Doc. No. 18 at

25   40).  BWS experts, however, may not testify to a defendant's state of mind.  *Erickson*,

26   Cal.App.4th at 1401.  Petitioner suggests in her Traverse that *Erickson* does not forbid counsel

27   from presenting experts to "testif[y] generally on BWS and its effects and giv[e] appropriate

28   hypotheticals" to aid the jury in "understanding Petitioner's mental processes as a BWS victim."

(Doc. No. 18 at 42).  The Court disagrees.  Such evidence speaks directly to Petitioner's state of mind and is not one of the three types of BWS evidence found relevant under *Erickson*.  Under this analysis, no BWS evidence is admissible in Petitioner's case.

In her Traverse, Petitioner further contends that evidence of duress can be used, not as a defense to murder, but as a defense to the underlying felony in a felony-murder charge.  (Doc. No. 18 at 39).  This argument also fails.  Although duress can be used generally as a defense in a felony-murder charge, in can only be used in certain circumstances.  *Erickson*, Cal.App.4th at 1401.  Petitioner cites *United States v. Homick*, 964 F.2d 899, 905 (9th Cir. 1992), in support of her argument that BWS evidence can be used to show duress.  In *Homick*, the Ninth Circuit noted that  "[t]he battered woman defense is a species of the defense of duress."  *Id.*  The *Homick* Court also noted, however, that "the unique nature of battered woman syndrome justifies a somewhat different approach to the way we have historically applied [duress] principles."  *Id.*  In California, this "different approach" is reflected in *Erickson*'s holding that BWS is only relevant in the three limited circumstances identified above.  Petitioner's proffered use of BWS evidence falls outside of *Erickson*'s limitations, and is therefore inadmissible.  Accordingly, Petitioner's trial and sentencing counsel were justified in not pursuing a meritless claim.

### 2.       Admissibility of BWS Evidence at Sentencing

As discussed above, in California, "[t]he meaning of relevance is no different in the context of mitigating evidence ... from what it is in any other context."  *People v. Farley*, 46 Cal.4th 1053, 1128 (2009) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (internal quotations omitted)).  Thus, "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id.*; *see* Cal. Evid. Code § 210 (West 2012).

Petitioner alleges that her sentencing counsel was ineffective, in part, for failing to present a BWS expert to mitigate her sentence.  Because the "meaning of relevance is no different in the context of mitigating evidence," sentencing counsel's decision to not attempt to present a BWS witness at sentencing that could not have been presented at trial is not unreasonable.

Although this Court finds that neither trial nor sentencing counsel were unreasonable for

failing to pursue a BWS defense, Petitioner's claim can also be read to suggest that sentencing counsel was deficient in failing to bring relevant mitigating evidence, that is, her relationship with Mr. Pope, before the sentencing court.  The record reflects, however, that the sentencing judge was fully apprised of Petitioner's relationship with Mr. Pope and its connection to the crime for which she was convicted.

Prior to Petitioner's testimony during sentencing, the following colloquy transpired between Petitioner's sentencing counsel, Elliott Kanter, and the sentencing judge:

MR. KANTER:  I know what she's going to say, basically.

THE COURT:  It's up to you.  I'm not pushing.  It's a tactical decision on your part.

...

MR. KANTER: ... What she was going to talk about is [Pope's] involvement.  I don't think that helps.  I don't know if it helps or hurts.

THE COURT:  If [Pope] was the one that was there and part of it, which would not probably surprise too many people, then if she wants to say that, then she's welcome to say whatever she wants to say.

MR. KANTER: He wasn't there, but he set it up, is what she's going to say.

THE COURT:  Can she prove it?

MR. KANTER:  Personally that's the problem.  We have talked ... I think it's a real story.  It makes sense.

THE COURT: I think that makes sense.  It just makes as much sense that she assisted [Pope] ...

(Lodgement 3 at 2234–36).

Petitioner then testified regarding Pope's involvement:

THE DEFENDANT: ... I was under duress.  I was taking orders from somebody else after everything happened.  That's why [trial counsel] calls for me and stuff like that, but it's taken me this long to realize this, that I had somebody in my life that beat me, that burned me.  I have marks.  I have stories.  I have so much stuff.

I denied it all to myself.  I denied the fact that, you know, if I didn't do something to please somebody, that they would beat me up.

...

... I was hiding the fact that I was trying to cover for someone else, trying to cover my own feelings ...

...

- 14 -

I believe that maybe [Pope] knew that and set me up, and it hurts that he's free and I'm not....  I'm ashamed that I let somebody control me, which ultimately led to [Salanti] dying.

(Lodgement 11 at 2238, 2240–41).

This colloquy and Petitioner's testimony demonstrate that the sentencing court was presented with the facts supporting Petitioner's imperfect BWS defense.  Indeed, Mr. Kanter demonstrates a certain skill by getting the underlying evidence before the sentencing judge despite the legal impediment to directly presenting BWS evidence in mitigation.  There was no prejudice to Petitioner.  The relevant facts were presented to the sentencing judge in a light favorable to Petitioner.   Accordingly, Petitioner's counsel at sentencing was not ineffective.

## VI. CONCLUSION

For the foregoing reasons, this Court recommends that Petitioner's Writ for Habeas be **DENIED**.

This report and recommendation will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1988).  Any party may filed written objections with the court and serve a copy on all parties by **March 16, 2012**.  The document shall be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed by **March 30, 2012**.

 The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED: February 24, 2012

Hon. Mitchell D. Dembin
U.S. Magistrate Judge