1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| AMY DAVIS,<br><br>                    Petitioner,<br>vs.<br><br>JAVIER CAVAZOS, Warden, et al.,<br><br>                    Respondents. | CASE NO. 11-CV-1193-H (MDD)<br><br>**ORDER DENYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254** |
|---|---|

On June 1, 2011, Amy Davis ("Petitioner"), a prisoner in custody in California, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner challenges the constitutionality of her conviction and sentence on the grounds that her trial and sentencing counsel were ineffective. On September 7, 2011, Javier Cavazos and Kamala Harris ("Respondents") filed a response in opposition. (Doc. No. 7.) On February 2, 2012, Petitioner filed a traverse to the petition for writ of habeas corpus. (Doc. No. 18.) On February 24, 2012, the magistrate judge issued a report and recommendation. (Doc. No. 20.) On May 7, 2012, Petitioner filed an objection to the magistrate judge's report and recommendation. (Doc. No. 25.) On May 7, 2012, Petitioner also filed a motion for a certificate of appealability. (Doc. No. 26.) For the following reasons, the Court denies Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and denies a certificate of appealability.

## Background

On April 11, 2007, a jury in Superior Court of California, County of San Diego, found Petitioner guilty of felony murder for killing and robbing Theodore Salanti. At trial, Petitioner testified that two men murdered the victim and that she took part in the crimes because she was acting under duress. Petitioner's trial testimony that two men were responsible for the murder was consistent with Petitioner's pre-arrest and post-arrest statements to police. At trial, defense counsel presented a duress defense and the court instructed the jury accordingly. Petitioner now claims, in direct contradiction to her trial testimony, that her former boyfriend was responsible for orchestrating the murder and robbery of the victim. Petitioner argues that her defense counsel were ineffective because they failed to discover her boyfriend's involvement and present a duress defense based on his involvement.

The following facts are taken from the California Court of Appeal decision in People v. Davis, No. D052605, 2009 WL 1744527, at *1-6 (Cal. Ct. App. June 22, 2009), and are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1):

> The victim, 57-year-old Theodore Salanti, and the defendant, 24-year-old Davis, were friends. Although the two apparently did not have a sexual relationship, Salanti's friends believed that he wished that Davis was his girlfriend. Salanti often gave Davis generous sums of money, provided her with drugs, and allowed her to use his car. Davis was a frequent guest at Salanti's condominium.
>
> Salanti was a drug dealer and user. He was known to keep large quantities of drugs, including methamphetamine and marijuana, in a safe located in his bedroom/workroom, and in other places around his condominium. He also was known to keep large sums of cash–often between $20,000 and $100,000–in his home. He kept drugs and cash in a home safe, and would sometimes hide cash under his carpet. Salanti often bragged about his money.
>
> Davis stole approximately $30,000 from Salanti at one point approximately a year before Salanti was killed. According to Davis, she offered to give the money back to Salanti, but he allowed her to keep it, told her not to steal from him again, and said that if she ever needed anything, she could just ask for it.
>
> **Salanti's Disappearance**
>
> One of Salanti's closest friends last saw Salanti alive on Friday, September 23, 2005. In the very early morning hours of September 23, Salanti sent an email to Davis in which Salanti said, "Hey I'm just forgetting about you. You back with your ex, so don't call or come over." Davis went to

Salanti's home on Saturday, September 24.

At 3:12 p.m. on September 24, Davis went to a 7-Eleven store near Salanti's condominium and bough a Slurpee, a Gatorade, M & M's, Blistex, and cigarettes. She paid with a $100 bill.

At 4:00 a.m. on September 25, Davis went to a Sav-On drugstore and purchased a "Wonder Wheeler" [a type of cart]. Davis also returned to the 7-Eleven nine different times that day, and bought, among other things, various cleaning products.

At about 5:30 p.m. on September 26, a locksmith called to follow up with Salanti regarding work that the locksmith had begun on Salanti's car on either September 23 or 24. The locksmith had made a number of unsuccessful attempts to reach Salanti by telephone during the intervening days. However, on the evening of September 26, a woman answered Salanti's telephone and told the locksmith that Salanti had gone out to get something to eat.

Salanti's neighbors saw Davis in the condominium complex and driving Salanti's car between September 23 and September 28. One neighbor saw Davis wearing a bathing suit. Davis appeared to walking to or from the complex pool. On September 28, Davis was pulled over by California Highway Patrol officers while she was driving Salanti's car.

**Discovery of Salanti's Body**

On Thursday, September 29, Salanti's friends called 911 after they had been unable to reach Salanti for a number of days and had observed things that they thought were suspicious inside his condominium. Fire officials responded to the call and pried open the front door. Once the door was open, they smelled the odor of a decomposing body. The fire officials discovered Salanti's body inside a suitcase in the entryway. The suitcase was wrapped in duct tape and covered with a comforter and a sleeping bag.

Salanti's face, including his nose and mouth, was covered in duct tape. His hands were tied behind his back with rope. There was duct tape around Salanti's right ankle. Two of his pants pockets were pulled inside out. His empty wallet was found in the master bedroom.

The medical examiner determined that Salanti had been dead for several days before his body was discovered. The cause of death was determined to be "homicidal violence including asphyxiation." Salanti's body was bruised, and he had six fractured ribs. Salanti's body tested positive for amphetamines, fentanyl, and marijuana.

Police found Davis's DNA on several items inside Salanti's condominium, including cigarette butts, a plastic cup, a latex glove found in the trash-can, a knife handle, and a box-cutter. A piece of latex glove with Davis's DNA on it was found attached to duct tape that matched the duct tape on Salanti's body. Davis's fingerprints were found all over the condominium.

At approximately 1:30 p.m. on Saturday, September 24, someone performed an internet search on Salanti's computer seeking information concerning Liberty floor safes. Additional searches were performed between 4:00 p.m. and 10:00 p.m. that day regarding how to locate and open safes. On

Tuesday, September 27, between 1:00 p.m. and 2:00 p.m., two searches were conducted on Salanti's computer. One involved how to get rid of the odor from a decaying body, and the other involved how to find a floor safe and open it.

In Salanti's car, investigators found papers that contained Salanti's banking information, blank checks, and documents regarding safes.

**Davis's Initial Statement to Police**

On October 1, 2005, San Diego police officers went to Davis's mother's home where they met with Davis. Davis agreed to accompany the officers to the police station for an interview. On the way to the station, Davis told the officers that she had been driving Salanti's car, and took them to the car. During the interview, Davis said that she had last seen Salanti alive on Thursday, September 22. She claimed that on that day, she borrowed Salanti's car because her car had broken down. Davis denied any knowledge of Salanti's death. She admitted to detectives that in the past she had stolen $30,000 from Salanti. According to Davis, Salanti had forgiven her.

Davis told the detectives that Salanti usually kept more than $100,000 in his condominium, and that he kept money in the safe in his home, and also hid money in other places throughout the home. Davis said that she knew the combination to Salanti's safe because he had given it to her. Detectives noticed that Davis had scratches on both of her hands.

On October 2, the day after Davis first spoke to detectives, Davis called detectives and left a voice-mail message in which she indicated that she had more information for them. Detectives met with Davis on October 4. She told the detectives that she had failed to tell them something on the previous occasion when she spoke with them because she was scared. She said that she had called the detectives to ask to speak with them again after she told her mother and brother "everything." Davis told the detectives that she knew that two men had been involved in Salanti's death.

According to Davis, two men who were armed with a knife approached her outside of Salanti's condominium while Salanti was gone. The men entered Salanti's condominium and stole his marijuana from a kitchen cupboard. The men then forced Davis to sit in the room where Salanti's desk was located. She heard Salanti come in, and she could hear the two men beating him. She tried not to listen, and claimed that she did not know what else had happened. Davis told the detectives that she ran outside, and that the two men told her to drive them to the intersection of El Cajon Boulevard and Utah Street. She asked the men whether they had hurt Salanti, and they assured her that they had not. One of the men said that he wanted Salanti's computer, so they were going to come back to Salanti's condominium. The men told Davis not to tell anyone about what had occurred.

Davis returned to Salanti's condominium alone, and sat outside. She assumed that this is when Salanti's neighbors saw her. However, Davis did not know on which day this occurred. She explained that she "was using" at that time. According to Davis, the men returned to Salanti's condominium two more times. They repeatedly threatened her and forced her to search the condominium for hidden money and drugs. After they left the last time, Davis entered the condominium. She did not see Salanti and did not know where he

was. However, later during the interview, Davis said that she found Salanti's lifeless body in a closet while the two men were in another room. She said that she did not know how Salanti's body ended up in the suitcase.

Davis alternatively claimed that the cart she purchased was for laundry, trash, or for "everything else" the men were going to steal from Salanti's place. Davis said that she was scared to call the police because the men were in a gang and could find her if she said anything to the police. Davis eventually admitted that she had taken drugs from Salanti's safe. She said that there had been a plan, and that she was going to "get a cut of money" and drugs for helping the men.

Davis said that after all this happened, she went to a friend's house. Davis told her friend what had happened and said that she was scared of the men.

**Davis's Arrest**

On October 12, 2005, police arrested Davis. Davis waived her <u>Miranda</u> rights and agreed to speak with detectives again. Davis reiterated that she did not know the two men, and said that they had approached her while she was outside Salanti's condominium, smoking. The men told her that they knew who she was, and said that they "knew [Salanti]'s whole situation." The men told Davis that they wanted to go inside Salanti's home, and said, "[W]e're here for a purpose and you already know what the purpose is and just work with us and I'll even give you a little bit of money."

According to Davis, the men went inside and found Salanti's marijuana. They told Davis to close the blinds. The men asked Davis to open the safe, which she did, but there was no cash in it. After a while, Davis thought that the men had left, and she played dominos on the computer. She went outside, and the two men returned. They forced her to go inside and then began to search for something in the kitchen. Davis went back into the office and started playing dominos again. Davis said that she did not know when Salanti came home, and that she did not hear him say anything to the men when he returned. She eventually heard a "ruckus" and then heard "kind of like a moan." Davis was surprised that Salanti had come into the home without her having seen him, since she had been watching out the office window for him to return.

After she heard the noises, Davis "knew immediately that they beat [Salanti] up." She "just froze inside." One of the men came into the room where Davis was and told her that "everything [was] gonna be their way now." Davis started to cry and asked the men where Salanti was. The men told Davis that they had beat up Salanti, but said that he was fine. They ordered her to search the house. Davis thought that the men were holding Salanti hostage and that if she helped them, they would leave. Davis proceeded to search the condominium for money. She eventually told the men that she could not find anything, but they told her to "try harder." Davis said that the men sent her to Sav-On to buy a cart so that the men could load it up with the things they wanted to take from Salanti's condominium.

Davis told police that she did not know that the men had killed Salanti at the time she was searching for the money. She eventually found Salanti's body in the closet while she was searching the bedroom. Davis thought one

of the men might have seen her looking in the closet where she found Salanti's body, but she tried to pretend that she did not know that Salanti was dead. The men ordered her to take clothes out of a suitcase, but she did not think that they were going to put Salanti's body in it. Davis said that she did not see the men put Salanti's body in the suitcase, but admitted that she helped them put duct tape around the suitcase.

The men had Davis drive them to El Cajon Boulevard and drop them off. After she dropped them off, Davis returned to Salanti's condominium. She estimated that the entire ordeal lasted approximately two days. Davis remained at Salanti's condominium until at least Tuesday, September 27.

**Davis's Trial**

Davis testified at trial. She continued to maintain that the two men who approached her outside Salanti's condominium had a knife, and that they had threatened her. She said that she did not know that Salanti had been killed until after she dropped off the men near El Cajon Boulevard. Davis testified that she had not found Salanti's body in a closet, but rather, that she found the body, already in the suitcase, after she returned from dropping off the two men.

At trial, Davis admitted that she had lied to the detectives when she told them that the men had directed her to look for money and drugs. She said that she had not opened the safe while the two men were still at the house, but after they had left. Davis acknowledged that she, alone, had caused all of the damage that had been done to Salanti's condominium. She explained that after she found Salanti dead, she did not know where to go. She was high on methamphetamine and thought that Salanti might have hidden money in a secret safe. Davis thought that if she found the money, she "could just run, basically, because [she] was freaked out." Davis also admitted that she was the one who had dragged the suitcase with Salanti's body inside to the front entryway of the condominium. When asked why she had done that, Davis replied, "I was trying to cover everything up. I thought that I could make everything just kind of go away. That's why there was a blanket on it. I didn't know what I was doing, to be honest. I just-I was freaked out. I didn't know what to do. I didn't-there was no way I was going to call the authorities, and I had nobody. I didn't know what to do, so I made a lot of stupid mistakes."

Davis disclaimed having helped the two men put duct tape on Salanti's body, and retracted her earlier admission to detectives that she had handed strips of the duct tape to the men. She admitted that she had used duct tape on a wall in the dining room and that she had put duct tape over the blanket that was found on top of the suitcase.

Davis testified that she did not intend to steal from Salanti when the men approached her on Saturday, September 24, or when she let the men into the condominium. She said that she also did not intend to steal from Salanti when she heard the men beating him up. Davis stated that she never had an agreement with the men for a "cut" of whatever was found in exchange for her participation in a scheme to steal from Salanti. She said that the reason she did not call the police after the incident was because Salanti had been robbed a number of times and had never reported any of the crimes to authorities. She said that Salanti had indicated to her that he did not want such incidents reported to the police.

> Dr. Alex Stalcup, medical director of the New Leaf Treatment Center in Lafayette, California, testified as an expert on methamphetamine use. Dr. Stalcup opined that during her interviews with police, Davis was going through the "crashing phase of the methamphetamine bing cycle." Dr. Stalcup testified that Davis's conduct after Salanti's death was consistent with that of a person on a methamphetamine binge or in the "tweaking" phase, which usually occurs 18 to 24 hours "into the binge, [and is a state] in which they maintain intoxication." According to Dr. Stalcup, individuals who are tweaking are able "able to think, but they're very, very high."

Based on her allegation that two men murdered the victim, Petitioner presented a duress defense at trial and the trial court instructed the jury on duress. (See Lodgment No. 3, RT 1981.) However, the jury found Petitioner guilty of first-degree murder with special circumstances of robbery and burglary, in violation of California Penal Code sections 187(a) and 190.2(a)(17). (Lodgment No. 3, RT 2158-59.) By finding Petitioner guilty of first-degree felony murder, the jury found that Petitioner was either the actual killer or a major participant in the crime. (See Lodgment No. 3, RT 1976.) On January 11, 2008, the trial court sentenced Petitioner to life in prison without the possibility of parole. (Lodgment No. 3, RT 2250.) Petitioner appealed the conviction and sentence to the California Court of Appeal. On June 22, 2009, the appellate court issued a decision affirming Petitioner's conviction and sentence. See Davis, 2009 WL 1744527, at *1. On September 9, 2009, the California Supreme Court denied Petitioner's petition for review of the court of appeal's decision. (Lodgment No. 9.) Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court on the grounds that her trial and sentencing counsel had been ineffective. (Lodgment No. 10.) On May 18, 2011, the California Supreme Court summarily denied Petitioner's habeas corpus petition. (Lodgment No. 11.)

On June 1, 2011, Petitioner filed a habeas corpus petition in this Court. (Doc. No. 1.) Petitioner claims that her trial and sentencing counsel were ineffective, in violation of the Sixth Amendment. (Doc. No. 1 at 1.)

///

///

///

### Discussion

**I.      Standard of Review**

A petitioner in state custody pursuant to the judgment of a state court may challenge her detention only on the grounds that her custody is in violation of the United States Constitution or the laws of the United States. 28 U.S.C. § 2254(a). The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. § 2254(d)), applies to § 2254 habeas corpus petitions filed after 1996. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Pursuant to AEDPA, a § 2254 habeas corpus petition must not be granted with respect to any claim adjudicated on the merits by a state court, unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or resulted in a decision based on unreasonable determination of the facts in light of the evidence presented in the state proceeding. 28 U.S.C. § 2254(d).

To determine what constitutes "clearly established federal law" under 28 U.S.C § 2254(d)(1), courts look to Supreme Court holdings existing at the time of the state court decision. Lockyear v. Andrade, 538 U.S. 63, 71-72 (2003). A state court decision is contrary to clearly established federal law when the court applies a rule that contradicts the governing law set forth in United States Supreme Court cases. Id. at 73 (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). A state court decision is also contrary to clearly established federal law when the court confronts a set of facts that are materially indistinguishable from a United States Supreme Court decision but reaches a result different from that Supreme Court decision. Id. A state court decision involves an unreasonable application of clearly established federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Penry v. Johnson, 532 U.S. 782, 792 (2001) (quoting Williams, 529 U.S. at 407-08) (internal quotation marks omitted). To be an unreasonable application of federal law, the state court decision must be more than incorrect or erroneous, it must be objectively unreasonable. Lockyear, 538 U.S. at 75.

When a state court issues a decision on the merits but does not offer any reasoning for

the decision, the court reviewing the habeas corpus petition is required to conduct an independent review of the record to determine whether the state court erred in its application of controlling federal law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2001). The court's independent review, however, is not de novo. Id. at 982. While the reviewing court independently reviews the record, it defers to the state court's ultimate decision. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

**II.    Ineffective Assistance of Counsel**

Petitioner argues that her trial and sentencing counsel were ineffective, in violation of the Sixth Amendment, due to counsels' failure to fully investigate Petitioner's alleged battered woman syndrome. (Doc. No. 1 at 1.) Petitioner does not contend that she was abused by the victim at any time. Rather, Petitioner claims that, contrary to her testimony at trial and to the police in her pre and post-arrest statements, her abusive, former boyfriend was involved in the crime and that she participated pursuant to her boyfriend's direction. (See Doc. No. 1 at 3-5.)

In criminal prosecutions, the Sixth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, guarantees assistance of counsel to the accused. See Strickland v. Washington, 466 U.S. 668, 685 (1984). To establish that counsel was ineffective, the person challenging the conviction must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687.

To establish that counsel's assistance was deficient, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. When considering a claim of ineffective assistance of counsel, a reviewing court must be highly deferential to counsel's performance. Id. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. A petitioner is tasked with the burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.

To show that the defense was prejudiced, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A petitioner has not established prejudice if she has only shown that counsel's errors had "some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's unprofessional errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

When a court examines counsel's effectiveness de novo, Strickland's two-part analysis is applied and the court must accord counsel's actions great deference. Harrington v. Richter, 131 S. Ct. 770, 788 (2011). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010). "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Harrington, 131 S. Ct. at 788. Because Strickland and § 2254(d) both establish "highly deferential" standards of review, review is "doubly" deferential when the two apply together. Id. When a state court has adjudicated an ineffective assistance of counsel claim on the merits, a federal court examining a § 2254 petition renewing the ineffective assistance claim "must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Id. A § 2254 habeas corpus claim may be presumed to have been adjudicated on the merits if it was presented to a state court, and the court denied relief. Id. at 784-85 (holding that the California Supreme Court's summary denial of petitioner's state habeas petition was adjudicated on the merits). When reviewing the state court's adjudication of a petitioner's § 2254 ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Id. at 785. The state court's application of Strickland was not unreasonable if "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788.

In Harrington, the Supreme Court concluded that the petitioner did not overcome the presumption that the state court adjudicated the case on the merits because he offered purely speculative reasons for why the California Supreme Court denied his petition without

1  explanation. Id. at 785 (stating that petitioner can overcome presumption by establishing that
2  "some other explanation for the state court's decision is more likely"). Here, Petitioner
3  similarly offers nothing to overcome the presumption that the claim was adjudicated on the
4  merits. Accordingly, the Court concludes that the California Supreme Court adjudicated
5  Petitioner's habeas corpus claim on the merits.
6        Thus, to establish that the California Supreme Court decision was contrary to federal
7  law or unreasonably applied Strickland's ineffective assistance of counsel standard, Petitioner
8  must show that there is no reasonable argument that counsel satisfied Strickland's deferential
9  standard. See Harrington, 131 S. Ct. at 788. The Court independently reviews the record to
10 determine whether the California Supreme Court's decision to deny Petitioner's habeas corpus
11 petition was an objectively unreasonable application of Strickland. See Delgado, 223 F.3d at
12 982. For the following reasons, Petitioner is unable to show that there is no reasonable
13 argument that her counsel did not satisfy Strickland's standard for effective counsel.
14       **A.  Petitioner's Sentencing**
15       Petitioner argues that sentencing counsel was ineffective because counsel failed to
16 present evidence of Petitioner's relationship with her allegedly abusive boyfriend. (Doc. No.
17 18-1 at 20, 39-40.) Petitioner argues that this would have been mitigating evidence and would
18 have supported a duress defense based on her boyfriend's alleged involvement in the murder.
19 Id. However, the record of Petitioner's sentencing hearing reflects that the sentencing judge
20 was familiar with Petitioner's relationship with her boyfriend and Petitioner's claim that her
21 boyfriend was involved in the crime for which she was convicted. (See Lodgment No. 3, RT
22 2234-35, 2238-41.)
23       At sentencing, Petitioner's counsel told the court "I know what's she's going to say,
24 basically" and the court responded "It's up to you. I'm not pushing. It's a tactical decision on
25 your part." (Lodgment No. 3, RT 2234-35.) Counsel responded that "[w]hat she is going to
26 talk about is [her boyfriend]'s involvement. I don't think it helps. I don't know if it helps or
27 hurts." (Lodgment No. 3, RT 2235.) The court responded that "[i]f [Petitioner's boyfriend]
28 was the one that was there and part of it, which would not probably surprise too many people,

1  if she wants to say that, then she's welcome to say whatever she wants to say." Id. Petitioner
2  then took the stand and testified "I was under duress. I was taking orders from somebody else
3  after everything happened. . . . I had somebody in my life that beat me, that burned me. I have
4  marks. I have stories. . . . I denied it all to myself. I denied the fact that, you know, if I didn't
5  do something to please somebody, that they would beat me up. . . . I believe that maybe [my
6  boyfriend] knew that and set me up, and it hurts me that he's free and I'm not. . . . I'm ashamed
7  that I let someone control me which ultimately led to [the victim] dying." (Lodgment No. 3,
8  RT 2238, 2241.)

9  The exchange between the sentencing judge and counsel and Petitioner's testimony
10  show that the sentencing judge was familiar with the facts supporting Petitioner's imperfect
11  duress defense based on her boyfriend's alleged involvement in the crime. Thus, sentencing
12  counsel ultimately admitted evidence of Petitioner's relationship with her boyfriend and
13  evidence supporting her imperfect duress defense. Accordingly, the Court concludes that the
14  California Supreme Court could have reasonably held that sentencing counsel acted reasonably
15  and was not ineffective. See Strickland, 466 U.S. at 688.

16  Petitioner also argues that the trial court would have imposed a lesser sentence if
17  sentencing counsel had admitted expert testimony regarding battered woman syndrome. (Doc.
18  Nos. 1 at 10, 18-1 at 26.) It is unlikely that expert testimony regarding battered woman
19  syndrome would have assisted the sentencing judge in understanding Petitioner's relationship
20  with her boyfriend or its effect on Petitioner given that Petitioner testified about the
21  relationship and its effects at sentencing. However, even if it would have assisted the judge,
22  expert testimony would not have reduced Petitioner's sentence.

23  In California, "[t]he penalty for a defendant who is found guilty of murder in the first
24  degree is death or imprisonment . . . for life without the possibility of parole" if the jury also
25  finds one or more special circumstances to be true. Cal. Penal Code § 190.2(a). The trial court
26  has no discretion, at sentencing or otherwise, to strike or dismiss a jury's finding of special
27  circumstances. Cal. Penal Code § 1385.1; People v. Mendoza, 52 Cal. 4th 1056, 1075 (2011).
28  If the jury finds first degree murder with special circumstances, the trial court has authority to

impose a sentence lesser than life without the possibility of parole only if the sentence violates the California Constitution or the United States Constitution. See People v. Dillon, 34 Cal. 3d 441, 478 (1983). "In such cases the punishment is reduced because the Constitution compels reduction, not because a trial court in its discretion believes the punishment too severe." People v. Mora, 39 Cal. App. 4th 607, 615 (1995).

Here, the jury found Petitioner guilty of first degree murder and found true the special circumstances of robbery and burglary. (Lodgment No. 24, RT 2158-59). The jury's finding eliminated any discretion the court may have had to impose a lesser sentence. See Cal. Penal Code § 190.2. The only way that sentencing counsel could have affected the sentence would have been to successfully show that the sentence violated the California Constitution or United States Constitution.

A sentence violates the California Constitution only when "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." Dillon, 34 Cal. 3d at 478. Findings of cruel or unusual sentences are an "exquisite rarity" and require the defendant to overcome a considerable burden to show disproportionality. People v. Weddle, 1 Cal. App. 4th 1190, 1196 (1991). To determine whether a sentence is disproportionate, California courts inquire into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors such as his age, prior criminality, personal characteristics, and state of mind." People v. Romero, 99 Cal. App. 4th 1418, 1431-32 (2002).

The facts of Petitioner's case are similar to those in People v. Johnson, 183 Cal. App. 4th 253 (2010), in which the appellant drove her co-defendant to a rob a gas station and the co-defendant killed the attendant. At sentencing, the appellant in Johnson submitted a battered woman syndrome expert's report that stated the appellant was addicted to methamphetamine and suffered from battered woman syndrome due to abuse from her boyfriend, who was involved in the robbery but not as the shooter. Id. at 298-99. The court acknowledged the report as mitigating evidence but reasoned that the appellant's voluntary participation in the crime "far outweighs" any mitigating circumstances. Id. at 299. Thus, the court held that the

sentence was not unconstitutional. Id.

In Johnson, the appellant's abuser was present at the robbery, the appellant was eighteen years old at the time of the crime, and the appellant had an ancillary role in the murder, yet the court concluded the sentence of life without parole to be constitutional. Id. at 299. Here, Petitioner's alleged abuser was not present at the crime, Petitioner was twenty-five years old when she committed the crime, and, as the appellate court stated, "there is sufficient evidence in the record to support a finding that Davis–and not an unidentified perpetrator–caused [the victim]'s death." Davis, 2009 WL 1744527 at *25. In light of Petitioner's higher culpability than the appellant in Johnson, it is unlikely that evidence of Petitioner's alleged battered woman syndrome would have affected the constitutionality of her sentence under the California Constitution.

The Eighth Amendment contains a narrow proportionality principle that applies in noncapital sentences. Ewing v. California, 538 U.S. 11, 20 (2003) (citing Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991)). Successful Eighth Amendment challenges to the proportionality of noncapital sentences are exceedingly rare. Id. at 290-91. The Supreme Court and Ninth Circuit have rejected Eighth Amendment challenges to sentences of life without the possibility of parole for crimes less severe than felony murder. See e.g., Harmelin, 501 U.S. at 996 (possession of 672 grams of cocaine); United States v. Jensen, 425 F.3d 698, 708 (9th Cir. 2005), (possession of methamphetamine with the intent to distribute) ; United States v. Van Winrow, 951 F.2d 1069, 1071 (9th Cir. 1991), (possession of 152 grams of cocaine). Given the greater severity of Petitioner's crime, it is unlikely that evidence of Petitioner's alleged syndrome would have affected the constitutionality of her sentence under the United States Constitution.

Because the court had no discretion to modify the sentence and evidence regarding battered woman syndrome admitted at sentencing likely would not have affected the constitutionality of Petitioner's sentence, Petitioner's sentencing counsel could not have prejudiced the outcome of the sentencing hearing by failing to admit evidence of battered woman syndrome. Accordingly, the California Supreme Court could have reasonably held that

Petitioner was not prejudiced by sentencing counsel's alleged deficiencies. See Strickland, 466 U.S. at 694.

### B. Trial Counsel's Investigation

Petitioner argues that her trial counsel was ineffective because counsel failed to fully investigate Petitioner's alleged battered woman syndrome. (Doc. No. 1 at 1.) Petitioner claims that if counsel had commissioned a battered woman syndrome expert to evaluate Petitioner, the evaluation would have revealed her boyfriend's allegedly extensive involvement in the crime. (Doc. No. 18-1 at 6.)

Petitioner does not explain, and it is not clear from the record, why an expert's analysis would have revealed Petitioner's boyfriend's alleged involvement when Petitioner testified at trial, contrary to her current claim, that her boyfriend did not have anything to do with the crime. (See Lodgment 3, RT 1585.) On direct examination at trial, defense counsel asked Petitioner if Petitioner's boyfriend "[had] anything to do with what happened to Mr. Salanti" and Petitioner responded, "[n]o, he did not." Id. Petitioner's failure to tell counsel what Petitioner now contends is the truth can not be used to claim counsel acted unreasonably by not discovering what Petitioner failed to disclose. See Strickland, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

Petitioner also argues that trial counsel should have known to investigate into whether Petitioner had battered woman syndrome based upon trial counsel's awareness of the existence of a police report filed against Petitioner's boyfriend by another woman and contemporaneous notes from a therapist's counseling session with Petitioner that stated "[Petitioner] does not want to lose him and wants to do whatever it takes to keep the relationship going." (Doc. No. 1 at 8.) When examining counsel's performance for reasonableness, courts must "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Viewed from counsel's perspective at the time and in light of Petitioner's claim that her boyfriend was not involved in the crime, it is unlikely that the police report and therapist's notes would have

1  indicated anything other than the fact that Petitioner had relationship problems with her
2  boyfriend. Accordingly, the California Supreme Court could have reasonably held trial
3  counsel did not act unreasonably by failing to investigate whether Petitioner had battered
4  woman syndrome and failing to discover Petitioner's boyfriend's alleged involvement. See
5  Strickland, 466 U.S. at 687.

6  In criminal actions in California, the prosecution or defense may admit expert testimony
7  regarding battered woman syndrome and its effects, "including the nature and effect of
8  physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of
9  domestic violence," so long as the expert's testimony is relevant and the expert is qualified.
10 Cal. Evid. Code § 1107. Battered woman syndrome evidence is relevant when there is
11 sufficient evidence that the syndrome applies to the defendant, and battered woman syndrome
12 testimony is probative of a contested issue. People v. Gadlin, 78 Cal. App. 4th 587, 592 (2000)
13 (citations omitted).

14 Expert testimony regarding the syndrome is generally admitted when a domestic
15 violence victim kills her abuser and claims self defense or imperfect self defense. See, e.g.,
16 Humphrey, 13 Cal. 4th 1073; In re Walker, 147 Cal. App. 4th 533 (2007); People v. Erickson,
17 57 Cal. App. 4th 1391 (1997); People v. Day, 2 Cal. App. 4th 405 (1992), overruled on other
18 grounds by People v. Humphrey, 13 Cal. 4th 1073, 1083-84 (1996) ; People v. Aris, 215 Cal.
19 App. 3d 1178 (1989), overruled on other grounds by Humphrey, 13 Cal. 4th 1073. In cases
20 involving claims of self defense, the evidence is probative of the abused person's mental state
21 and can bolster credibility by explaining why the abused did not abandon the relationship. See,
22 e.g., Humphrey, 13 Cal. 4th at 1086, 1087.

23 Evidence regarding battered woman syndrome is also admitted to repair the credibility
24 of victims of domestic violence who testify inconsistently or recant earlier statements
25 incriminating their abusers. See, e.g., People v. Brown, 33 Cal. 4th 892 (2004); People v.
26 Williams, 78 Cal. App. 4th 1118 (2000); Gadlin, 78 Cal. App. 4th at 587; People v. Morgan,
27 58 Cal. App. 4th 1210 (1997). In these situations, the evidence can help reconcile
28 inconsistencies or offer motives for recantations. See Brown, 33 Cal. 4th at 906-07; Williams,

78 Cal. App. 4th at 1128; Morgan, 58 Cal. App. 4th at 1214-15. Petitioner argues that trial and sentencing counsel were ineffective because they failed to introduce evidence of battered woman syndrome to bolster Petitioner's credibility at trial and sentencing. (Doc. Nos. 1 at 10, 18-1 at 38-39.) However, Petitioner has not cited any cases that support the proposition that battered woman syndrome evidence is probative of the credibility of a witness whose abuser was not on trial and who did not kill her abuser in self defense. See id. Accordingly, Petitioner is unable to show that her defense counsel acted unreasonably by not presenting battered woman syndrome evidence to support credibility.

In People v. Coffman, 34 Cal. 4th 1, 98-99 (2004), the California Supreme Court held that the trial court properly instructed the jury that it could accept testimony about battered woman syndrome to determine whether the defendant acted under duress when she assisted her abusive boyfriend in murdering a young woman. When a defendant claims self defense, evidence of battered woman syndrome is relevant because it is probative of whether the defendant "actually and reasonably believed in the need to defend" against the person who abused the defendant. See Humphrey, 13 Cal. 4th at 1082, 1087. Similarly, evidence of the syndrome may be relevant to a duress defense when it is probative of whether the defendant had the requisite mental state to commit a crime at the direction of an abusive partner. See Coffman, 34 Cal. 4th at 99-100.

Petitioner argues that evidence of battered woman syndrome would have been relevant to a duress defense based on her boyfriend's alleged involvement in the crime because it was probative of her mental state at the time of the crime.[1] (Doc. Nos. 1 at 7-8, 18-1 at 40-42.) In the cases examining the relevance of battered woman syndrome evidence to a defendant's mental state, the abusive partners were involved in the crimes charged. See, e.g., Coffman, 34 Cal. 4th 1 (abusive boyfriend was co-defendant and allegedly directed defendant to participate

---

[1] At trial, Petitioner presented testimony of Dr. Stalcup, an expert on methamphetamine addiction, to explain the effects that methamphetamine use had on Petitioner. Dr. Stalcup's testimony was used by the defense to explain the inconsistencies in Petitioner's statements to police, Petitioner's erratic and confusing behavior during her time at the victim's house, and Petitioner's mental state during the crime. (Lodgment No. 3, RT 1416-22, 1438, 1442.) Dr. Stalcup's testimony was also used to explain why Petitioner would have been more susceptible to another person's orders and threats. (Lodgment No. 3, RT 1436.)

1  in the crime); Humphrey, 13 Cal. 4th 1073 (abusive husband was defendant's victim); Aris,
2  215 Cal. App. 3d 1178 (abusive husband was defendant's victim).

3        In her testimony at trial, Petitioner stated that her boyfriend did not have anything to do
4  with the crime for which Petitioner was convicted. (See Lodgment No. 3, RT 1585.) Without
5  knowledge or indication that Petitioner's boyfriend was involved in the crime, trial counsel
6  would have had no reason to investigate battered woman syndrome as possible support for a
7  duress defense because the evidence would have been irrelevant to Petitioner's own
8  explanation of what occurred. See Strickland, 466 U.S. at 691 ("[The] reasonableness of
9  counsel's actions may be determined or substantially influenced by the defendant's own
10  statements or actions," specifically, the "information supplied by the defendant.") Counsel's
11  decision to focus on a duress defense based on Petitioner's description of the crime instead of
12  investigating irrelevant defenses is a strategic decision that a reviewing court is supposed to
13  give great deference. See id. at 689 ("[T]he defendant must overcome the presumption that,
14  under the circumstances, the challenged action might be considered sound trial strategy.").
15  Accordingly, the California Supreme Court could have reasonably held that trial counsel did
16  not act unreasonably by not investigating whether Petitioner had battered woman syndrome.
17  See id. ("[W]hen the facts that support a certain potential line of defense are generally known
18  to counsel because of what the defendant has said, the need for further investigation may be
19  considerably diminished or eliminated altogether.").

20      **C.**    **Duress Defense**

21        Petitioner argues that had trial counsel done a thorough investigation, counsel would
22  have been able to present a successful duress defense to the felony murder charge. (See Doc.
23  No. 18-1 at 6.) Even assuming Petitioner's counsel was unreasonable in not investigating
24  whether Petitioner had battered woman syndrome, Petitioner could not have presented a
25  successful duress defense to felony-murder.

26        Pursuant to California Penal Code section 26, a person is incapable of committing a
27  crime where the act is committed under threats sufficient to show that the person had
28  reasonable cause to believe, and did believe, her life would be endangered if she refused. Cal.

Penal Code § 26. Section 26, however, does not provide a defense for those whose "crime be punishable with death." Id. As interpreted by the California Supreme Court, section 26 prohibits a duress defense to a murder charge but allows duress as a defense to the underlying felony or felonies in a felony murder charge. People v. Anderson, 28 Cal. 4th 767, 780, 784 (2002).

To establish duress as a defense to a crime, the defendant must establish that there was a threat, that a reasonable person would have believed that refusing to comply would be life threatening, and that the defendant actually believed that refusing to comply would be life threatening. Cal. Penal Code § 26. To satisfy section 26, the threat of violence must be imminent and immediate. People v. Lo Cicero, 71 Cal. 2d 1186, 1191 (1969); People v. Petznick, 114 Cal. App. 4th 663, 676-77 (2003) (stating that "a threat of death to be carried out at some undefined time" is insufficient to support a duress defense). "Decisions upholding the duress defense have uniformly involved a present and active aggressor threatening immediate danger." Petznick, 114 Cal. App. 4th at 676 (quoting Lo Cicero, 71 Cal. 2d at 1191) (internal quotation marks omitted). A successful duress defense also requires that, given the imminence of the threat, violating the law was the only reasonable alternative. People v. Condley, 69 Cal. App. 3d 999, 1012 (1977); People v. Galambos, 104 Cal. App. 4th 1147, 1164 (2002).

As to duress, evidence of battered woman syndrome is relevant to explain why the defendant believed noncompliance would result in death and why a reasonable person in defendant's situation would have believed the same. See Coffman, 34 Cal. 4th at 98-100. Further, duress was only a viable defense to the underlying burglary and robbery, not the murder charge. See Cal. Penal Code § 26. Assuming Petitioner's claims are true, her boyfriend's threat was not immediate or imminent because he was not in Petitioner's presence and was in no position to cause her immediate harm if she did not comply with his orders to rob the victim. (See Doc. Nos. 1 at 4-5, 18-1 at 7-8.) Given the lack of an immediate threat to her life from her boyfriend, Petitioner could have fled the scene, called the police, or done many other reasonable alternatives that did not involve taking money or drugs from the victim or stealing his car. During sentencing, Petitioner acknowledged her ability to take actions

1  other than steal the victim's property when she stated "I was scared to go back empty handed
2  . . . . I could have [gone] to the police. I could have done a lot of things." (Lodgment No. 3,
3  RT 2239.) Thus, it is unlikely that Petitioner could have established a successful duress
4  defense to the robbery and burglary even if her latest version of the crime is taken as true.

5  Further, trial counsel presented a duress defense to the felony-murder charge and the
6  trial court instructed the jury accordingly. (Lodgment No. 3, RT 1981.) The jury rejected this
7  defense when it found Petitioner guilty. The California Supreme Court could have reasonably
8  held that Petitioner was not prejudiced by trial counsel's lack of investigation into battered
9  woman syndrome, failure to discover Petitioner's boyfriend's alleged involvement, and failure
10 to present a duress defense based on Petitioner's boyfriend's alleged involvement. See
11 Strickland, 466 U.S. at 694.

12 Because the California Supreme Court could have reasonably held that counsel did not
13 act unreasonably and Petitioner's defense was not prejudiced, Petitioner is unable to show that
14 there is not "any reasonable argument that counsel satisfied Strickland's deferential standard."
15 Harrington, 131 S. Ct. at 788. Accordingly, the Court concludes that the California Supreme
16 Court's denial of Petitioner's habeas corpus petition was not contrary to, or involve an
17 unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

## Conclusion

19 Based on the foregoing, the Court denies Petitioner's petition for writ of habeas corpus
20 pursuant to 28 U.S.C. § 2254. The Court also denies a certificate of appealability.

21 **IT IS SO ORDERED**.
22 DATED: August 6, 2012

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT